# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| Annousa Senouthai, | : | |
| Debtor. | : | Bankruptcy No. 15-15396-MDC |
| | | |
| Virakone Meksavanh, Otilla Roldan, Phaytoun Sundara, Kunthy You, Vixay Saendouthay, Bounome Khounvisay, and Manivanh M. Khounxay, | : : | |
| Plaintiffs, | : | |
| v. | : | Adversary No. 15-00425-MDC |
| Anousa Senouthai and Ratsamy Senouthai, | : | |
| Defendants. | : | |

# MEMORANDUM

BY:  THE HONORABLE MAGDELINE D. COLEMAN, UNITED STATES BANKRUPTCY JUDGE

## I.    INTRODUCTION

The plaintiffs, Virakone Meksavanh, Otilla Roldan, Phaytoun Sundara, Kunthy You,

Vixay Saendouthay, Bounome Khounvisay, and Manivanh M. Khounxay (collectively, the

"Plaintiffs") in this adversary proceeding assert that their claims against the debtor, Anousa

Senouthai ("Debtor"), and his wife, Ratsamy Senouthai ("Mrs. Senouthai," and together with the

Debtor, the "Senouthais"), for unpaid returns on investments are nondischargeable pursuant to

two provisions of title 11 of the United States Code, 11 U.S.C. §101, *et seq.* (the "Bankruptcy

Code") - §523(a)(2)(A), which excepts from a debtor's discharge debts obtained by false

pretenses, a false representation, or fraud, and §523(a)(4), which excepts from a debtor's

discharge debts for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or

larceny.  Mrs. Senouthai, a non-debtor defendant, has moved to dismiss the claims against her

for lack of subject matter jurisdiction.  The Debtor and Mrs. Senouthai also deny that the

Debtor's alleged debts to the Plaintiffs are nondischargeable.  For the reasons stated herein, the

Court will grant Mrs. Senouthai's motion to dismiss the claims against her because this Court

lacks subject matter jurisdiction over them.  The Court will rule in favor of the Debtor on the

Plaintiffs' claim that the Debtor's debts to them are nondischargeable pursuant to §523(a)(4)

because the Plaintiffs failed to meet their burden of proof on this claim.  The Court, however,

finds that the Debtor's debts to the Plaintiffs are nondischargeable pursuant to §523(a)(2) to the

extent that the Debtor continued to collect money from the Plaintiffs after learning that the funds

from which they were to be repaid were no longer available.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Complaint

The Debtor filed a voluntary bankruptcy petition under chapter 7 of the Bankruptcy Code

on July 29, 2015.  The Plaintiffs filed the complaint (the "Complaint") against the Debtor and

Mrs. Senouthai on October 5, 2015, asserting that the Senouthais' alleged debts to them are

nondischargeable.

The Complaint alleges that the Plaintiffs and the Senouthais are part of a cultural

community comprised in large part of Laotian-American citizens.  Complaint at ¶15.  The

Plaintiffs aver that the Senouthais held themselves out in that community as experts in business

and financial investment, and promoted an "investment opportunity" to the Plaintiffs whereby

"money deposited would be invested in various business opportunities, and would be payable on

demand."  Complaint at ¶¶16-18.  According to the Plaintiffs, the Senouthais represented to them

that the more money they invested and the longer they left their money invested, the higher a rate of return they would enjoy, outpacing a traditional savings account.  Complaint at ¶¶19-21.

The Plaintiffs allege the Senouthais made these representations knowing they were false, or at least with recklessness as to whether or not they were true, and that the Senouthais had no intention of investing the Plaintiffs' money or providing any return on their investments.  Complaint at ¶¶22-23.  Rather, the Plaintiffs' allege the Senouthais operated "what appeared to be a classic Ponzi scheme" through which the Plaintiffs transferred the following amounts to the Senouthais:[1]

| Plaintiff | Alleged Transfer | Alleged Rate of Return Promised |
|---|---|---|
| Virakone Meksavanh | $88,000 | 20% |
| Otilla Roldan | $6,000 | 20% |
| Phaytoun Sundara | $6,480 | 20% |
| Kunthy You | $4,500 | 20% |
| Bounome Khounvisay | $58,800 | 10% |
| Manivanh M. Khounxay | $23,300 | 20% |
| **Total** | **$187,080** | |

Complaint at ¶¶24, 29-41.[2]  According to the Plaintiffs, although the Senouthais "did make certain small payments to their investors," they have since refused to return any money provided to them, make an accounting of the money the Plaintiffs deposited with them, explain where the Plaintiffs' money is, or pay the Plaintiffs back.  Complaint at ¶¶43-46.

---

[1] Although the Complaint alleges that these amounts are the totals each Plaintiff transferred to the Senouthais, the testimony at trial revealed that certain Plaintiffs transferred more than the amount attributed to them in the Complaint but were repaid certain amounts.  The amounts alleged in the Complaint represent the unpaid balance of transfers each Plaintiff alleges they are owed, not the total amount each Plaintiff transferred.

[2] The Complaint also alleged that Plaintiff Vixay Saendouthay transferred $20,000 to the Senouthais.  At the start of trial, however, counsel for the Plaintiffs advised the Court that one of the Plaintiffs allegedly had made a loan, not an investment in the Senouthais' alleged scheme, and moved to withdraw that portion of the Complaint.  Trial Part 1, 19:14 to 20:6.  Counsel did not advise as to which of the named Plaintiffs he was referring, and has not formally amended the Complaint or otherwise withdrawn that Plaintiff's claim on the docket.  The only named Plaintiff that did not testify at trial, however, was Vixay Saendouthay.  The Court therefore understands that his claim has been withdrawn, and in any event no evidence was offered supporting it.

Although the Complaint's allegations are somewhat vague regarding the specific nature of the investment opportunity the Senouthais are alleged to have presented to the Plaintiffs, through subsequent motion practice and the trial in this matter it has become clear that the "classic Ponzi scheme" the Plaintiffs reference in the Complaint is a financial activity conducted in some Laotian communities called the "Hoi," sometimes referred to as the "Hoi game." Trial Part 1, 12:19 to 12:22; 35:20 to 35:22. Generally, the Plaintiffs describe the Hoi as a collective pool of money the community puts together that can thereafter be withdrawn by participants in the Hoi. Trial Part 1, 12:19 to 13:5. The Plaintiffs assert that they each contributed varying amounts to the Hoi with the expectation, based on the Senouthais' alleged representations, that they would receive the amount they contributed plus a return on their investment. Complaint at ¶¶28-42.

The parties dispute the Debtor's role in the Hoi. The Plaintiffs allege that the Hoi was operated by the Debtor along with Mrs. Senouthai, who together fraudulently collected money from the Plaintiffs under the pretense of administering the Hoi. Trial Part I, at 12:19 to 14:5. The Plaintiffs therefore argue that the Senouthais are obligated to repay the amounts the Plaintiffs contributed to the Hoi, and that such debts are not dischargeable pursuant to §523(a)(2) and §523(a)(4). The Senouthais, on the other hand, assert the Debtor had little or nothing to do with the Hoi, which was administered by Mrs. Senouthai as "mother" of the Hoi. Trial Part I, at 23:13 to 24:14. The Senouthais argue that as a result, the Plaintiffs cannot establish the necessary elements for nondischargebility under either §523(a)(2) or §523(a)(4).

B. **The Testimony and Evidence at Trial**

A trial on the Plaintiffs' objections to discharge was conducted on January 7, 2017 and

April 28, 2017.[3]  The parties presented testimony and evidence regarding the Hoi, largely

centered on the roles the Debtor and Mrs. Senouthai are alleged to have had.  Each of the

Plaintiffs testified at trial regarding their introduction to and participation in the Hoi and their

interactions with the Debtor and Mrs. Senouthai.  The Debtor also testified regarding his role in

the Hoi and his interactions with each of the Plaintiffs.  A summary of that testimony and the

other evidence admitted at trial follows.

### 1.    Manivanh Khounxay ("Khounxay")

Khounxay testified that she knew the Debtor through Mrs. Senouthai and the community,

and had known the Debtor for 15 or 20 years.  Trial Part 1, 25:25 to 26:1; 35:10 to 35:11.

Khounxay was told about the Hoi by a friend named Connie, after which Khounxay contacted

Mrs. Senouthai to ask if she could participate.  Trial Part 1, 35:14 to 36:24; 42:10 to 43:6.

Khounxay understood the Hoi to be "money that was given to [the Debtor] and his wife, with

knowing that we would get interest on it, hopefully that we entrusted in him through the years

that I am involved in it."  Trial Part 1, 26:2 to 26:7.  According to Khounxay she joined the Hoi

on October 26, 2013, and contributed for 29 weeks.  Trial Part 1, 26:22 to 26:23; 29:12 to 30:1.

During that time, Khounxay contributed $35,560, and received $12,260 in distributions, leaving

a net balance of $23,300 in contributions for which she was not paid back.  Trial Part 1, 29:11 to

30:1.

When asked whether she ever had any direct discussions with the Debtor about the Hoi,

Khounxay responded only that every time she attempted to collect her distribution "his wife"

---

[3] Citations herein to the testimony at trial on January 17, 2017 are referenced as "Trial Part 1" and citations to the
testimony at trial on April 28, 2017 are referenced as "Trial Part 2."

would tell Khounxay she needed to play for another ten weeks.  Trial Part 1, 26:4 to 27:6.

Khounxay did testify, however, that she and her husband gave her Hoi contributions directly to

the Debtor.  Trial Part 1, 28:16 to 29:4.  Khounxay also testified that both the Debtor and Mrs.

Senouthai gave her the understanding that she would receive a 20% return on the money she

contributed.  Trial Part 1, 29:1 to 29:8.  Admitted into evidence at trial was an agreement

between Khounxay and Mrs. Senouthai, providing that Mrs. Senouthai owed Khounxay $23,300.

Trial Part 1, 30:11 to 30:20; Exhibit P-1.  The Debtor was not a party to the agreement and it

does not state that the Debtor is also liable to Khounxay for any amount.  Trial Part 1, 35:1 to

35:9.

Seemingly at complete odds with Khounxay's testimony that she had known him for

many years, the Debtor testified that he did not recall who Khounxay was and that he had never

spoken to her about the Hoi or anything else.  Trial Part 2, 44:4 to 44:17.

### 2.    Virakone Meksavanh ("Meksavanh")

At the time of trial, Meksavanh was engaged to the Debtor's stepsister, and had formerly

been in a band with the Debtor.  Trial Part 1, 47:15 to 47:20; Trial Part 2, 37:9 to 37:14.

Meksavanh testified that he first learned of the Hoi through his fiancé, and Mrs. Senouthai later

approached him about joining the Hoi in 2009 or 2010, explaining that he would receive a 20%

return on his contributions.  Trial Part 1, 55:22 to 56:11.  According to Meksavanh, the

conversation he had with Mrs. Senouthai was the first time he learned about a Hoi.  Trial Part 1,

62:7 to 62:21.  Meksavanh testified that he joined the Hoi on July 29, 2011, and contributed for

approximately 124 weeks, until December 19, 2013.  Trial Part 1, 49:13 to 49:19.  During that

time, Meksavanh contributed $99,900 and received $11,900 in distributions, leaving an

unreturned balance of $88,000.  Trial Part 1, 49:20 to 50:4.  According to Meksavanh, he elected

to delay his collection of distributions until the "last hand" of the Hoi because he wanted to earn more interest to buy a house.  Trial Part 1, 62:24 to 63:17.

Meksavanh testified that he understood both the Debtor and Mrs. Senouthai were "running" the Hoi and they were both "always involved."  Trial Part 1, 47:5 to 47:7; 67:7 to 67:18.  Once he joined the Hoi in 2011, at times Meksavanh would drop his contributions off with the Debtor and at other times with Mrs. Senouthai, which he understood meant both were responsible for controlling the Hoi.  Trial Part 1, 48:16 to 48:22; 49:10 to 49:12; 67:10 to 67:18.[4] Meksavanh also testified that during his band's weekly practices, which Mrs. Senouthai would attend, Meksavanh would discuss the Hoi with Mrs. Senouthai and the Debtor because they were family, and would see each other every week.  Trial Part 1, 60:24 to 61:10.

When asked whether the Senouthais ever told him what happened to the money he contributed to the Hoi but had not been repaid, Meksavanh testified that he understood "somebody took it … we were told [$]500,000, $600,000 that somebody just took off and ran away with the money."  Trial Part 1, 50:16 to 50:23.  Meksavanh further testified that the Senouthais said they were going to pay him back the money he contributed to the Hoi, which Mrs. Senouthai and Meksavanh verbally agreed would be paid back in installments coupled with two lump sum payments.  Trial Part 1, 52:13 to 53:2; 65:12 to 66:4.  In furtherance of that agreement, Meksavanh retained counsel to draft a contract for the repayment, which Meksavanh "attempted" to make between himself and both of the Senouthais, though he acknowledged that "at the time" it was with only Mrs. Senouthai.  Trial Part 1, 54:16 to 54:25; 55:12 to 55:17.[5]

---

[4] Confusingly, when asked whether he had any conversations with the Debtor at the time he began contributing to the Hoi, Meksavanh testified that he had a conversation with Mrs. Senouthai around Valentine's Day of 2013.  Trial Part 1, 60:6 to 60:19.

[5] At trial, the Plaintiffs introduced a February 20, 2014 letter from Meksavanh's counsel to the Senouthais, purporting to set forth the payment agreement.  See Plaintiff Exhibit 4.  That exhibit, however, was admitted solely

According to Meksavanh, that contract was not signed because the Senouthais "refused to come over at that time." Trial Part 1, 66:17 to 66:22. Admitted into evidence at trial, however, was a February 14, 2014 check from the Debtor to Meksavanh for $5,000, which Meksavanh testified represented a portion of the $11,900 he was paid back for his contributions to the Hoi. Trial Part 1, 51:8 to 51:19.

The Debtor presented somewhat conflicting testimony. Although he acknowledged getting money from Meksavanh for the Hoi and giving it to Mrs. Senouthai, the Debtor could not recall how often Meksavanh gave him money for the Hoi. Trial Part 2, 38:21 to 39:5. The Debtor also testified that he did not discuss the Hoi with Meksavanh, how Meksavanh could participate, or how Meksavanh would get money from the Hoi. Trial Part 2, 38:13 to 38:20.

### 3.      Otilla Roldan ("Roldan")

Roldan first learned of the Hoi from Mrs. Senouthai's mother, with whom she works and through whom she met the Debtor in 2008. Trial Part 1, 74:22 to 75:9. With respect to the Hoi at issue, after learning of it Roldan spoke with Mrs. Senouthai by phone to confirm her participation. Trial Part 1, 76:7 to 76:12. Roldan testified that Mrs. Senouthai told her she would earn 20% on the money she contributed. Trial Part 1, 73:17 to 73:20. Roldan played two "hands" of $100 per week, the first starting June 28, 2013, and the second starting October 4, 2013. Trial Part 1, 72:21 to 73:5.[6] Roldan testified that she contributed to the Hoi by sometimes giving the money to Mrs. Senouthai's mother at the Senouthais' home, and sometimes giving it to the Debtor. Trial Part 1, 72:12 to 72:20. At some point thereafter, Roldan had a conversation

---

for the purpose of showing that Meksavanh retained counsel who sent a letter to the Senouthais on which Meksavanh was copied. It was not admitted for purposes of establishing the truth of its content.

[6] Roldan appears to have been involved in more than one Hoi with the Senouthais, as she testified that she first became involved in a Hoi "run by" the Senouthais in 2008 and that "for previous years they are very nice, they pay good but 2014 – 2013 it slowed …." Trial Part 1, 72:3 to 72:11.

with Mrs. Senouthai, as mother of the Hoi, advising that she would be the last person to be repaid her money in the Hoi. Trial Part 1, 76:18 to 77:9. Roldan testified that she contributed $6,000 to the Hoi but did not receive any distribution back. Trial Part 1, 73:9 to 73:16. Rather, according to Roldan, at some point around March 7, 2014, Mrs. Senouthai called her to let her know "there was a problem," but did not tell her what the problem was. Trial Part 1, 73:1 to 73:8; 78:1 to 78:16.

The Debtor testified that he had "heard of" Roldan as a participant in the Hoi, and she would drop money off at the Senouthais' home. Trial Part 2, 39:6 to 39:13. He also admitted that he would see Roldan "in front of the house," but testified that he did not speak with her about the Hoi and had never seen her before she started participating in the Hoi. Trial Part 2, 39:14 to 39:21. The Debtor did, however, acknowledge that he received money from her that he would give to Mrs. Senouthai. Trial Part 2, 39:22 to 40:1.

### 4.      Phaytoun Sundara ("Sundara")

Sundara testified that he had known the Debtor through the local Laotian community for approximately 12 years. Trial Part 1, 79:21 to 80:1. He learned of the Hoi in 2012 or 2013 from "the community," but the first time he discussed it with either of the Senouthais was in 2013 through a conversation with Mrs. Senouthai. Trial Part 1, 83:2 to 83:23. Sundara joined the Hoi in May 2013 and contributed $100 per week until June 2014, for a total contribution of $5,500. Trial Part 1, 81:8 to 81:14. He testified that he would contribute to the Hoi by giving cash directly to the Debtor at the Debtor's home, although he also testified that he would give the cash to "both … whoever was there, whomever was present, but usually both were home." Trial Part 1, 80:10 to 80:24. Sundara testified that "the Senouthais" advised him that he would get a 20% return on the money he contributed, but he did not receive any distribution and every time he

asked what happened to his money, "they just said they – they don't have it every time I ask them."  Trial Part 1, 81:15 to 82:3.

The Debtor testified that he knew Sundara through their temple, but that he had never spoken with him about the Hoi.  Trial Part 2, 40:23 to 41:5.  The Debtor testified that Sundara would give his contributions to Mrs. Senouthai, but also acknowledged that if Mrs. Senouthai was not available, Sundara would give the contribution to the Debtor or his child, which would then be given to Mrs. Senouthai.  Trial Part 2, 41:8 to 41:17.

### 5.    Bounome Khounvisay ("Khounvisay")

Khounvisay was a co-worker of the Debtor.  Trial Part 1, 88:2 to 88:4.  She testified that she learned of the Hoi in 2009 when Mrs. Senouthai asked her to "get involved," and thereafter invested in the Hoi "run by" the Debtor and Mrs. Senouthai.  Trial Part 1, 87:20 to 88:7; 89:4 to 89:16.  Khounvisay testified that she invested $250 per week in the Hoi for 214 weeks, and in total contributed $53,500 to the Hoi on account of which she did not receive any distribution. Trial Part 1, 88:8 to 88:20; 90:10 to 90:15.  Khounvisay testified that she gave her contribution to Mrs. Senouthai and understood that Mrs. Senouthai would hold the money and distribute the money as "mother" of the game.  Trial Part 1, 90:2 to 90:8; 91:4 to 91:15.  She also testified that she sometimes gave her contribution to the Debtor, who would come to her house, understanding that it was to then go to Mrs. Senouthai.  Trial Part 1, 92:6 to 92:8.

The Debtor acknowledged that Khounvisay was a former co-worker of his but asserted that he had never spoken to her about the Hoi.  Trial Part 2, 43:9 to 43:24.  He also acknowledged, however, that Khounvisay had given contributions to the Hoi to him and stated that he then gave those to Mrs. Senouthai.  Trial Part 2, 43:25 to 44:3.

6.    **Kunthy You ("You")**

You is a co-worker of Roldan's, who in turn is an acquaintance of the Senouthais, as discussed above.  Trial Part 1, 95:13 to 95:23.  You testified that she participated in the Hoi by giving her contribution to a co-worker named Wan to give to "the wife and husband."  Trial Part 1, 96:1 to 96:7.[7]  According to You, she contributed $100 per week to the Hoi beginning on March 8, 2013, and continued for 62 weeks, for a total contribution of $6,200.  Trial Part 1, 97:12 to 98:2.  Of that contribution, she was repaid $1,700, leaving an unpaid amount of $4,500.  Trial Part 1, 98:4 to 98:8.  You testified that Mrs. Senouthai "had the Hoi," and that she understood Mrs. Senouthai was the "mother" of the Hoi responsible for holding and paying out the money.  Trial Part 1, 97:2 to 97:7; 99:6 to 99:16.  When asked if she had ever spoken to the Debtor, You testified that she did at some point in 2013 after she began contributing to the Hoi.  Trial Part 1, 99:6 to 99:16.  You also testified that when she later tried to contact "them" to ask where her money was, "they said they [didn't] have the money."  Trial Part 1, 98:9 to 98:11.

The Debtor testified that he knew You from their temple but had never spoken to her about the Hoi.  Trial Part 2, 42:10 to 42:13.

7.    **The Debtor**

On direct examination, the Debtor testified that he was familiar with the Hoi but had never played.  Trial Part 2, 34:14 to 34:18.  He stated that he had never had any responsibilities with respect to the Hoi, had never spoken with anybody to get them to participate in the Hoi, never told anyone how the Hoi worked, and never spoke with anyone about the rate of return they could get if they participated in the Hoi.  Trial Part 2, 35:12 to 35:25.  When asked if anybody ever provided him with money for the Hoi, the Debtor asserted that when someone

---

[7] It is unclear from the testimony whether You's reference to Wan is a reference to Roldan or is instead a reference to another individual with whom You works who also knows the Senouthais.

dropped money off at his house, he would deliver it to Mrs. Senouthai and kept none of it. Trial Part 2, 36:16 to 37:4; 66:19 to 66:25. According to the Debtor, "[he] took the money, all of the money but [he] did not know anything about it. [He] just gave all of the money to [his] wife." Trial Part 2, 44:25 to 45:4. The Debtor testified that other than occasionally receiving money and delivering it to his wife, he did not have any responsibilities for keeping track of the money in the Hoi, discussing the Hoi with any of the participants, or anything else with respect to the Hoi. Trial Part 2, 46:11 to 47:19.

On cross examination, however, the Debtor acknowledged that, at his deposition, he testified that he would not just collect money when participants came to his home but would also go to their homes for the purpose of collecting their contributions. Trial Part 2, 59:17 to 60:6. He also acknowledged on cross-examination that, at his deposition, he testified that he helped Mrs. Senouthai make payment to participants in the Hoi. Trial Part 2, 63:1 to 63:5. Moreover, the Debtor admitted on cross-examination that he wrote the $5,000 check to Meksavanh because he owed Meksavanh money related to the Hoi. Trial Part 2, 70:3 to 70:25.

The Debtor testified that he heard a woman named Connie "got the money" from the Hoi. Trial Part 2, 45:5 to 46:7.[8] He also agreed that, when deposed, Mrs. Senouthai testified that Connie had "walked off with over $600,000" and therefore she could not repay the Plaintiffs their contributions to the Hoi. Trial Part 2, 57:24 to 58:2. Of critical importance to the Court's analysis of the Plaintiffs' claims, the Debtor testified that he did not know what his wife told participants after Connie took the Hoi money, but admitted that he did not alert any of the Plaintiffs to that fact after he learned of it, and instead continued to collect their money for the Hoi. Trial Part 2, 64:23 to 66:2; 67:19 to 67:21.

---

[8] There was no testimony as to whether the "Connie" that allegedly took the Hoi money is the same woman who told Khounxay about the Hoi.

Following the close of the trial on April 28, 2017, the parties were directed to and have submitted post-trial briefing. The Court took the matter under advisement.

III.   **DISCUSSION**

   A.    **The Court Does Not Have Jurisdiction Over the Plaintiffs' Claims Against Mrs. Senouthai**

Before determining whether the Plaintiffs have established that the Debtor's alleged debts to them are nondischargeable, the Court will first address its jurisdiction to hear the Plaintiffs' claims against Mrs. Senouthai. The Complaint asserts two counts against the Senouthais. Count I asserts that the alleged debts arising from the Hoi are not dischargeable pursuant to §523(a)(2)(A) of the Bankruptcy Code. Complaint at ¶¶50-56. Count II asserts that the debts arising from the Hoi are not dischargeable pursuant to §523(a)(4) of the Bankruptcy Code. Complaint at ¶¶57-63. The Complaint does not assert any additional claims against Mrs. Senouthai under non-bankruptcy law.

It is undisputed that Mrs. Senouthai is not a debtor before this Court. Section 523(a) excepts certain types of debts from *an individual debtor's* discharge. 11 U.S.C. §523(a) (emphasis added). The plain language of the statute limits its application to debtors, and to the extent a party is not a debtor, §523 has no application. Because Mrs. Senouthai is not a debtor, §523(a) has no application to her. The Plaintiffs' claims against Mrs. Senouthai only seek a determination that her alleged debts to them are nondischargeable under §523(a), and therefore this Court does not have jurisdiction over them. *See, e.g., Rahman v. Qureshi (In re Qureshi)*, 2015 Bankr. LEXIS 3041, at *6-7 (Bankr. D.N.J. Sept. 8, 2015) (granting non-debtor defendant's motion to dismiss non-dischargeability complaint for lack of subject matter jurisdiction because as a non-debtor, §523(a) did not apply to it); *Paredes v. Albert (In re Albert)*, 2018 Bankr. LEXIS 949, at *16-17 (Bankr. C.D. Cal. Mar. 29, 2018) (dismissing claims

13

under §§523 and 727 against non-debtor defendant with prejudice because as a non-debtor it was

not eligible for a discharge, rendering the plaintiffs' causes of action seeking to deny the non-

debtor defendant a discharge unnecessary and claims for which no relief could be granted); *In re*

*Philpott*, 509 B.R. 134, 140 (Bankr. S.D. Ohio Mar. 10, 2014) (dismissing nondischargeability

complaint against non-debtor defendants for lack of subject matter jurisdiction).

The Court will grant Mrs. Senouthai's motion to dismiss and will dismiss the Plaintiffs'

claims against her with prejudice for lack of subject matter jurisdiction.[9]

### B.   Nondischargeability Under §523(a)(2)(A) and §523(a)(4)

#### i.   Legal Standard Under §523(a)(2)(A)

Count I of the Complaint alleges that the Debtor "obtained money from Plaintiffs under

false pretenses, a false representation, and/or actual fraud."  Complaint at ¶52.  This allegation

tracks §523(a)(2)(A) of the Bankruptcy Code, which excepts from an individual chapter 7

debtor's discharge any debt "for money … to the extent obtained by … false pretenses, a false

representation, or actual fraud …."  11 U.S.C. §523(a)(2)(A).  It appears the Plaintiffs are

alleging that the Debtor's debts to them fall under one or more of the distinct concepts

enumerated in §523(a)(2)(A).[10]

A goal of the bankruptcy process is to provide debtors with a fresh start, and exceptions

to discharge are construed strictly against the creditor and liberally in favor of the debtor.  *Linder*

*v. Berry (In re Berry)*, 2012 Bankr. LEXIS 4668, at *8 (Bankr. W.D. Pa. Oct. 2, 2012) (*citing*

*Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1113 (3d Cir. 1995)).  The Plaintiffs must

---

[9] The dismissal does not constitute a determination on the merits.  Plaintiffs are free to pursue claims against Mrs. Senouthai in any non-bankruptcy forum.

[10] The Court acknowledges that the Complaint's remaining allegations with respect to Count I are based on "false statements" the Debtor allegedly made to Plaintiffs, Complaint at ¶¶53-55, but given that misrepresentations giving rise to nondischargeable debts can be express or implied, the Court does not believe these allegations narrow the Plaintiffs' nondischargeability theory under §523(a)(2)(A) only to affirmative representations by the Debtor.

prove the elements of their §523(a)(2)(A) nondischargeability claim by a preponderance of the evidence. *Berry*, 2012 Bankr. LEXIS 4668, at *9 (*citing Grogan v. Garner*, 498 U.S. 279, 285 (1991)).

In order for a plaintiff to prevail under the false representation provision of §523(a)(2)(A), it must demonstrate that (1) the debtor made representations knowing they were false; (2) the debtor made the representations with the intent and purpose of deceiving the plaintiff; (3) the creditor justifiably relied on the debtor's false representations; and (4) the creditor suffered a loss or damage as a proximate consequence of the representation having been made. *Monarch Capital Corp. v. Bath (In re Bath)*, 442 B.R. 377, 387 (Bankr. E.D. Pa. 2010).

The elements of establishing a claim for false pretenses are similar, but there is a distinction between a debt incurred by a false representation and one incurred by false pretenses: "the 'false representation' ground requires a showing that the debtor made a 'false or misleading statement about something.' The second option, 'false pretense,' requires proof of an implied misrepresentation promoted knowingly and willingly that creates a misleading understanding of the transaction by the plaintiff." *Id.* at 387 (*quoting In re Giquinto*, 388 B.R. 152, 165 n.26 (Bankr. E.D. Pa. 2008)). As such, a plaintiff alleging a debt was incurred by false pretenses must prove that: (1) there was an omission or implied misrepresentation; (2) promoted knowingly and willingly by the debtor; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff; and (4) which wrongfully induced the plaintiff to advance money, property or credit to the debtor. *Id.* Whether asserting a false representation or false pretenses, a showing of fraudulent intent is required, and the court must look at the debtor's intention at the time the debt arose. *LL Lifestyle, Inc. v. Vidal (In re Vidal)*, 2012 Bankr. LEXIS 4198, at *47-48 (Bankr. E.D. Pa. Sept. 6, 2012).

Finally, to prevail on a claim of actual fraud under §523(a)(2)(A), the plaintiff must prove that: (1) the debtor obtained money, property or services through a material misrepresentation; (2) the debtor, at the time of the transaction, had knowledge of the falsity of the misrepresentation or reckless disregard or gross recklessness as to its truth; (3) the debtor made the representation with intent to deceive; (4) the plaintiff reasonably relied on the representation; and (5) the plaintiff suffered loss, which was proximately caused by the debtor's conduct. *Lewandowski v. Moeller (In re Moeller)*, 2014 Bankr. LEXIS 1236, at *19 (Bankr. D.N.J. Mar. 31, 2014); *see also In re Ritter*, 404 B.R. 811, 822 (Bankr. E.D. Pa. 2009) (listing the same elements needing to be proved in order for a debt to be declared non-dischargeable under §523(a)(2)(A)).

Two principles apply generally to claims under §523(a)(2).  First, an affirmative misrepresentation from the debtor is not required for a debt to be deemed nondischargeable under §523(a)(2)(A).  Rather, silence, omissions or a failure to disclose material facts on which a transaction depends can bring a debt under the statute.  *See Wolstein v. Docteroff (In re Docteroff)*, 133 F.3d 210, 216 (3d Cir. 1997) (a finding of "actual fraud" under section 523(a)(2)(A) may be predicated on a failure to disclose a material fact); *Lewandowski v. Moeller (In re Moeller)*, 2014 Bankr. LEXIS 1236, at *19 (Bankr. D.N.J. Mar. 31, 2014) ("The first element of fraud pursuant to Section 523(a)(2)(A) requires a material misrepresentation that includes words (written or oral), conduct, or omissions.  This representation can come in the form of silence.") (internal citations omitted).  Second, a plaintiff can prove a debtor had an intent to deceive by establishing that the debtor acted with gross recklessness as to the truth. *U.S. Sec. & Exch. Comm. v. Bocchino (In re Bocchino)*, 794 F.3d 376, 382 (3d Cir. 2015).

### ii.    Legal Standard Under §523(a)(4)

Count II of the Complaint seeks a determination that the Debtor's debts to the Plaintiffs are nondischargeable under §523(a)(4) of the Bankruptcy Code.  Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. §523(a)(4).  Section 523(a)(4) effectively presents three distinct causes of action: (1) fraud or defalcation while acting in a fiduciary capacity; (2) embezzlement; or (3) larceny.  *Sibbet v. Presutti (In re Presutti)*, 540 B.R. 154, 169 (Bankr. W.D. Pa. 2015).  To establish grounds for nondischargeability based on fraud or defalcation, a plaintiff must prove that the debtor acted as a fiduciary, while proof of a fiduciary relationship is not required for claims alleging embezzlement or larceny.  *Id.  LL Lifestyle, Inc. v. Vidal (In re Vidal)*, 2012 Bankr. LEXIS 4198, at *59 (Bankr. E.D. Pa. Sept. 6, 2012).

The Plaintiffs allege in the Complaint that the Debtor "while acting in a fiduciary capacity, obtained money from Plaintiffs under false pretenses, a false representation, and/or actual fraud."  Complaint at ¶59.  This allegation does not track the language of §523(a)(4).  Instead, it conflates the language in §523(a)(2)(A) with the language in §523(a)(4).  The Plaintiffs further allege that the Debtor, while acting in a fiduciary capacity, obtained money from Plaintiffs by making false statements to Plaintiffs, which were reasonably relied on by Plaintiffs, made with the specific intent that Plaintiffs would rely upon them and with the intent to deceive Plaintiffs.  Complaint at ¶¶60-62.  The Plaintiffs could have sought relief according to each of the three legal principles afforded under §523(a)(4), but these allegations reflect that Plaintiffs focus exclusively upon the theory that the Debtor's debt to them is for "fraud or

defalcation while acting in a fiduciary capacity." Nowhere does the Complaint set forth any

allegations regarding embezzlement or larceny, or even mention those terms.[11]

To prevail on this discrete cause of action, the Plaintiffs must establish by a

preponderance of evidence that the Debtor (1) acted in a fiduciary capacity and (2) engaged in

fraud or defalcation while acting in such capacity. *Vidal*, 2012 Bankr. LEXIS 4198, at *65.

"Fiduciary capacity" generally has a narrower meaning in bankruptcy than its traditional

common law definition. *Vidal*, 2012 Bankr. LEXIS 4198, at *65; *Estate of Harris v. Dawley (In

re Dawley)*, 312 B.R. 765, 777 (Bankr. E.D. Pa. 2004). For purposes of §523(a)(4), a fiduciary

relationship requires an express or technical trust, and implied and constructive trusts are

insufficient to create a fiduciary relationship. *Vidal*, 2012 Bankr. LEXIS 4198, at *66; *Dawley*,

312 B.R. at 777. Thus, a trust imposed as a result of the wrongful act out of which the debt arose

does not fulfill the fiduciary capacity requirement – the debtor must have been a trustee before

the wrong occurred and without reference to it. *Dawley*, 312 B.R. at 777. An express trust under

Pennsylvania law requires that there be (1) a trustee, (2) an ascertainable res, and (3) a

beneficiary for whom the trust is held. *Id.* (*citing Sherwin v. Oil City Nat. Bank*, 229 F.2d 835

(3d Cir. 1956), *Penn. Manufacturers' Assoc. Ins. Co. v. Desiderio (In re Desiderio)*, 213 B.R. 99

(Bankr. E.D. Pa. 1997)). The parties must also manifest their intention to create a trust. *Dawley*,

312 B.R. at 777. An express or technical trust may also be "based on relationships in which trust

type obligations are imposed pursuant to statute or common law, provided that the statute

---

[11] The Plaintiffs' post-trial brief argues in cursory fashion that "there really is no dispute that defalcation, embezzlement or larceny has occurred," but makes no further attempt to persuade the Court that the evidence establishes embezzlement or larceny has occurred. Bankr. Docket No. 75. Particularly when considering a Complaint that did not assert embezzlement or larceny, the Court will not consider this throw-away sentence in the post-trial brief as having put embezzlement or larceny at issue. *See Holmes v. Bulei (In re Bulei)*, 1995 Bankr. LEXIS 983, at *14 (Bankr. E.D. Pa. July 20, 1995) (including an argument under section 727 of the Bankruptcy Code in a post-trial brief without moving to amend the complaint to include it rendered it inappropriately argued and it therefore could not be considered in disposition of the matter).

imposes specific trust duties with respect to a trust res." *Kahle v. Roemmele (In re Roemmele)*, 2011 Bankr. LEXIS 3953, at *20 n.11 (Bankr. E.D. Pa. Oct. 11, 2011); *see also Tershon v. Jurewicz (In re Jurewicz)*, 2003 Bankr. LEXIS 677, at *10 n.11 (Bankr. E.D. Pa. June 25, 2003).

If the Plaintiffs establish that the Debtor was in a fiduciary relationship with them within the narrow scope of §523(a)(4), they must also establish that the Debtor committed a fraud or defalcation in that role. In the context of §523(a)(4), fraud involves intentional deceit, rather than implied or constructive fraud. *Vidal*, 2012 Bankr. LEXIS 4198, at *67 (internal citations omitted). Defalcation includes any failure to account for funds that have been entrusted to a fiduciary. *Id.* ("For purposes of section 523(a)(4), 'defalcation' is limited to situations where a fiduciary misappropriates or otherwise fails to account for money or property held in her fiduciary capacity.") Defalcation requires a culpable state of mind involving knowledge of, or gross recklessness with respect to, the improper nature of the relevant fiduciary behavior. *Bullock v BankChampaign, N.A.*, 569 U.S. 267, 269 (2013); *Fogg v. Pearl (In re Pearl)*, 502 B.R. 429, 440 (Bankr. E.D. Pa. 2013). *Bullock* has been read to create two scienter levels that may constitute a nondischargeable defalcation: (1) defalcation involving bad faith, moral turpitude, or other immoral conduct (such as self-dealing), and (2) defalcation involving less-culpable recklessness, *i.e.*, a conscious disregard of, or a willful blindness to, a substantial and unjustifiable risk. *Pearl*, 502 B.R. at 440.

## C.    Analysis of Plaintiffs' Claims

As an initial matter, the Court finds, based on the evidence, that the Debtor was more than a mere middleman with respect to the Hoi. The Plaintiffs each credibly testified that they gave at least some of their contributions to the Hoi to the Debtor and discussed the Hoi to some extent with him after they began participating. The Debtor asks this Court to conclude that his

role collecting the Plaintiffs' Hoi contributions was happenstance, occasional, and done without

any understanding as to what the Hoi was.  He admitted, however, that his role was not limited to

simply taking contributions from participants if his wife was not available to collect them.

Rather, he actively collected participants' contributions at their homes and at work.  It is simply

not credible, in the face of the Plaintiffs' testimony to the contrary, that in making these

collections the Debtor had no conversations with the Plaintiffs about the Hoi.  Moreover, the

Debtor admitted that he helped his wife make payments with respect to the Hoi.  That fact is

clear from the $5,000 check the Debtor wrote to Meksavanh, which the Debtor admitted was

done because he owed Meksavanh the money due to his participation in the Hoi.  Taken as a

whole, the testimony establishes that the Debtor, while clearly not primarily responsible for

administering the Hoi, took an active role in some aspects of it, including collecting funds from

the Plaintiffs.  As such, the Court finds that whatever the legal nature of the Hoi, the Debtor

played more than an accidental and uninformed part in it.

   The Court's finding that the Debtor was at least partially responsible for administering

the Hoi, however, does not render the debts incurred in connection with it nondischargeable.

Rather, that determination depends on whether the Plaintiffs have satisfied the requirements of

§§523(a)(2) or (a)(4).  As noted above, the burden is on the Plaintiffs to prove the elements of

§523(a)(2)(A) and §523(a)(4) by a preponderance of the evidence.  Furthermore, in order to

satisfy their evidentiary burden, the Plaintiffs were required to identify the Debtor's culpable

behavior with specificity.  *See, e.g., Enter. Maint. & Contr. v. Tadlock (In re Tadlock)*, 2012

Bankr. LEXIS 6273, at *10-11 (Bankr. M.D. Fla. Mar. 22, 2012) (finding that the plaintiff had

failed to satisfy its burden under §523(a)(2) because its evidence of the debtor's alleged false or

misleading representation lacked specificity); *Fickes v. Fickes (In re Fickes)*, 2011 Bankr.

LEXIS 3811, at *25 (Bankr. D. Colo. Sept. 30, 2011) (finding the plaintiff did not meet its

burden under §523(a)(2) because the pleadings and testimony during trial failed to produce any

evidence showing with specificity that the debtors made a false representation).

The Court first turns to the Plaintiffs' claim under §523(a)(4) because it can be more

summarily disposed of than the claim under §523(a)(2)(A).  The Court concludes that the

Plaintiffs did not establish the Debtor acted in a fiduciary capacity necessary for success on that

claim.  As noted above, in order to establish an express trust with respect to their contributions to

the Hoi, the Plaintiffs were required to establish by a preponderance of evidence that, among

other things, they and the Debtor manifested an intention to create a trust.  The Plaintiffs'

testimony, however, did not establish with the requisite specificity that the Debtor intended to

create a trust over which he would serve in a fiduciary capacity as the trustee.  None of the

Plaintiffs were able to support that theory of nondischargeability with specific and credible

evidence regarding the words or actions of the Debtor.  Although, as discussed above, the Court

concludes based on the evidence that the Debtor played a more active role in the Hoi than he

would have the Court believe, the Court does not believe the act of collecting the Plaintiffs'

contributions at times and discussing the Hoi with them rises to the level of a manifested intent

to serve in a fiduciary capacity with respect to their Hoi contributions, particularly in light of the

narrow scope through which fiduciary status is viewed under §523(a)(4).  The Court therefore

concludes that the Plaintiffs have failed to meet their burden with respect to a necessary element

of the distinct cause of action they are pursuing under §523(a)(4), rendering it unnecessary to

determine whether they established fraud or defalcation for purposes of that claim.

Having found that the Plaintiffs did not meet their burden to establish that their debts are

nondischargeable under §523(a)(4), the remaining question is whether they have done so under

§523(a)(2)(A).  The Court finds that no Plaintiff established with the necessary specificity that, at the time they decided to participate in the Hoi by contributing money to it on a weekly basis, the Debtor made any express representations to them regarding their participation in the Hoi, how the Hoi worked, or the return they could expect through their contributions to the Hoi.  Rather, the testimony shows that when joining the Hoi, each of the Plaintiffs had their conversations regarding how it worked and the return they could expect to receive from their participation with Mrs. Senouthai, or in the case of You, with neither of the Senouthais.  No Plaintiff provided specific and credible testimony that the Debtor told them anything about the Hoi at the time they decided to join it.  Nor did any of the Plaintiffs establish that once they were contributing to the Hoi, the Debtor made any affirmative representations to them that induced them to continue their participation in the Hoi.  Rather, only Meksavanh was able to credibly testify as to the regular conversations he had with the Debtor about the Hoi after Meksavanh began participating in it, and even Meksavanh did not testify as to any specific representation or misrepresentation the Debtor made regarding the Hoi.  While the Court believes it likely, based on the testimony, that the Debtor had conversations about the Hoi with each of the Plaintiffs during the course of their participation, no Plaintiff provided any specific testimony sufficient to establish that the Debtor induced their continued contributions by representation or misrepresentation.

While the Plaintiffs did not establish that the Debtor acquired their Hoi contributions by express misrepresentation, that does not end the inquiry into nondischargeability under §523(a)(2)(A).  The Plaintiffs still succeed on that claim if they established that the Debtor incurred the Hoi debts to them by false pretenses or fraud.  The Court concludes that the evidence does not establish the Plaintiffs' theory that the Senouthais took their Hoi contributions with no intention of repaying them.  This argument is belied by the fact that several of the

Plaintiffs were repaid a portion of the contributions they made, and the testimony from Roldan

that the Senouthais had in years prior to 2013 or 2014 been "good" with payment.

However, once Connie absconded with the Hoi pot, circumstances changed dramatically.

It is clear from the testimony that the Senouthais realized at that point that repayment to Hoi

participants would be difficult, if not impossible.  Given that realization, the Court concludes that

any Hoi contributions the Debtor received from the Plaintiffs after the point he learned the Hoi

pot was gone were obtained by false pretenses and/or fraud.  For purposes of determining

whether his debts to the Plaintiffs are nondischargeable under §523(a)(2)(A), the Debtor had an

obligation, once he knew that Connie had "walked off" with the Hoi pot, to ensure the Plaintiffs

were aware of that turn of events before continuing to collect Hoi money from them.  He failed

to do so, admitting that he instead continued to collect their contributions.  Construing what

constitutes money obtained by false pretenses under §523(a)(2)(A), the Debtor's silence despite

his knowledge that the Hoi pot was gone, and with it the ability to repay the participants as

promised, constitutes an omission or implied misrepresentation which he promoted knowingly

and willingly to the extent he continued to collect the Plaintiffs' Hoi contributions as if there had

been no change in circumstances.  This continued collection of funds created a material

misunderstanding by the Plaintiffs and induced them to continue to make weekly contributions

under the mistaken belief that there were no problems with the Hoi or the Senouthais' ability to

make distributions.  As such, any contributions each Plaintiff made to the Hoi after the Debtor

became aware that Connie had stolen the Hoi pot were obtained by false pretenses, and those

debts are nondischargeable as to the Debtor.  *See Bath*, 442 B.R. at 387.

Those debts are also nondischargeable because they were procured by fraud, for the same

reason.  To the extent the Debtor collected contributions from the Plaintiffs after Connie

absconded with the Hoi pot, his silence about the inability to repay the Plaintiffs constitutes fraud under the statute. *See Docteroff*, 133 F.3d at 216 (a finding of actual fraud under the statute may be predicated on a failure to disclose a material fact). The Debtor knew that continuing to collect any of the Plaintiffs' contributions would promote their understanding that they would be repaid, and the Debtor intended that they would continue to operate with that understanding. The Debtor may argue that it was his wife who was responsible for administering the Hoi and therefore he would not have known what the ramifications of Connie's act were for the Hoi, but given his knowledge, the Debtor at a minimum acted with reckless disregard or gross recklessness as to whether the Plaintiffs would receive any repayment with respect to their continued contributions. *Bocchino*, 794 F.3d at 382 (a debtor's intent to deceive can be proven by establishing that the debtor acted with gross recklessness as to the truth). To the extent the Plaintiffs continued to make contributions, they reasonably relied on the Debtor's continued collection in believing they would be repaid and suffered losses as a result. The Plaintiffs have therefore also established that such contributions were procured by fraud under §523(a)(2)(A). *Moeller*, 2014 Bankr. LEXIS 1236, at *9.

The problem for the Plaintiffs is that there was no testimony or other evidence presented regarding when Connie absconded with the Hoi pot, when the Debtor became aware of that, and how much in contributions each Plaintiff made, if any, after that point. However, given the Court's conclusion that the Plaintiffs have established that such amounts, if any, are nondischargeable, the Court will allow the Plaintiffs additional discovery into those issues, and will hold a hearing at a future date to determine the exact amounts of each Plaintiff's claim, if any, that are nondischargeable.

IV.   **CONCLUSION**

For the reasons discussed above, this Court will dismiss the Complaint in its entirety as to Mrs. Senouthai.  The Court will also enter judgment in favor of the Debtor on Count II of the Complaint.  With respect to Count I, the Court finds the Plaintiffs have established that all amounts, if any, the Debtor collected from them after he learned the Hoi pot was no longer available to repay them constitute nondischargeable debts pursuant to §523(a)(2)(A) of the Bankruptcy Code.  The Court will hold a further hearing to determine those amounts.

An Order consistent with this Memorandum Opinion will be entered.

Dated:  March 26, 2019

_____
MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

Christopher A. Bradley, Esquire
Swain Law Firm, P.C.
2410 Bristol Road
Bensalem, PA 19020

Robert M. Bovarnick, Esquire
Bovarnick & Associates, LLC
One South Broad Street, Suite 1600
Philadelphia, PA 19107